# Exhibit A

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA
U.S. Department of Justice, Antitrust Division
450 Fifth Street, NW, Suite 4100
Washington, DC 20530

STATE OF MARYLAND
200 St. Paul Place, 19th Floor
Baltimore, MD 21202

STATE OF ILLINOIS
115 S. LaSalle Street, Floor 23
Chicago, IL 60603

STATE OF NEW JERSEY
124 Halsey Street – 5th Floor
Newark, NJ 07102

and

STATE OF NEW YORK
28 Liberty Street
New York, NY 10005,

        *Plaintiffs,*

    v.

UNITEDHEALTH GROUP INCORPORATED
9900 Bren Road East
Minnetonka, MN 55343

and

AMEDISYS, INC.
3854 American Way, Suite A
Baton Rouge, LA 70816,

        *Defendants.*

Civil Case No:_____

## COMPLAINT

1.      Millions of older Americans, some of the most vulnerable patients in our healthcare system, benefit from receiving skilled healthcare in their homes. These patients, who may need extra assistance after a recent hospitalization or require help to manage chronic conditions like heart failure, diabetes, or lung disease, get the chance to recover at home instead of in hospitals or rehabilitation facilities. Millions more hospice patients choose to spend their final days in the comfort of their own homes. Receiving critical healthcare services, emotional support, therapy services, and quality-of-life assistance in the familiarity of their homes allows hospice patients to live out their last days with dignity as pain-free and peacefully as possible.

2.      UnitedHealth Group Incorporated ("UnitedHealth") and Amedisys, Inc. ("Amedisys") are two of the largest home health and hospice service providers in the country. Today, competition between UnitedHealth and Amedisys benefits millions of Americans who need home health or hospice services. But the proposed merger between UnitedHealth and Amedisys would forever eliminate that competition. Under the law, the proposed merger is presumptively anticompetitive and illegal. The United States and the state Attorneys General of Maryland, Illinois, New Jersey, and New York bring this action to preserve competition in markets that impact many of the most vulnerable patients in America during their most vulnerable moments.

3.      The fact that this merger would extinguish competition at the expense of Americans is not a secret. Indeed, both UnitedHealth and Amedisys recognize the value that direct competition between the two companies provides to patients today. As Amedisys's former CEO and current Board Chairman said, the "pure competition" between Amedisys and UnitedHealth means the two companies "keep each other honest and we keep driving better and better quality. And who benefits from it? Our patients." Today, UnitedHealth and Amedisys

compete vigorously against each other across their home health and hospice businesses. Amedisys celebrates "stealing share" from UnitedHealth and develops its strategy with UnitedHealth in mind. For its part, UnitedHealth has aspired to "put a dent in Amedisys." Now, by seeking to acquire Amedisys, UnitedHealth would expand its home health and hospice presence to an additional five states as well as gain nearly 500 locations across 32 states where it already competes.

4.    Competition between the two companies also benefits the skilled nurses who provide home health and hospice services. UnitedHealth and Amedisys are each other's "biggest competition" for employing nurses providing those services. UnitedHealth identifies Amedisys as among its "Main 3" competitors for nurses, targets Amedisys as its "first line of attack" in recruiting campaigns, and celebrates "kicking [Amedisys's] [*]ss in hiring." Nurses who provide home health and hospice services receive better wages and other employment terms as a result of the direct competition between UnitedHealth and Amedisys.

5.    UnitedHealth's plan to extinguish Amedisys as a competitor is the result of an intentional, sustained strategy of acquiring, rather than beating, competition. In 2022, UnitedHealth had concluded that home healthcare—including home health and hospice services—would "grow exponentially as the baby boom ages and as Millennials move into older cohorts." Recognizing that it could not "build enough capacity internally" to quickly establish the kind of outsized grip on the industry it has amassed elsewhere, in February 2023 UnitedHealth acquired LHC Group, Inc. ("LHC"), which was, at the time, the nation's third-largest home health provider and a large hospice provider. Now under UnitedHealth's umbrella, LHC is the second-largest home health provider.

6.      Just months after completing its acquisition of LHC, UnitedHealth saw an opportunity to grow even larger. In May 2023, Amedisys—the largest home health and hospice company in the country as of 2022—agreed to merge with infusion provider OptionCare. But the merger between Amedisys and OptionCare presented a competitive threat to UnitedHealth's goal to "grow exponentially." To prevent that from happening, UnitedHealth was willing to pay. And pay it did, both through what is commonly known as a "breakup fee" to OptionCare for terminating its merger with Amedisys, and then separately by enticing Amedisys with a $3.3 billion merger offer. Even though Amedisys's Chief Financial Officer and Chief Operating Officer acknowledged in handwritten notes that the OptionCare deal would be better for both employees and patients, Amedisys ultimately agreed to be subsumed into UnitedHealth's fold.

7.      The competition at stake with the proposed merger of UnitedHealth and Amedisys is significant. Unlike OptionCare, which did not compete directly with Amedisys, UnitedHealth and Amedisys are direct competitors. If this merger proceeds, the combination of UnitedHealth and Amedisys would result in UnitedHealth's control of 30 percent or more of the home health or hospice services in eight states.

8.      The two companies are such large competitors that their proposed merger is presumptively anticompetitive and illegal in hundreds of local markets across America, implicating billions of dollars in commerce.

9.      The anticompetitive effects of this merger impact patients, as well as those who do the hard work of caring for those patients: by reducing competition for nursing services. In hundreds of labor markets throughout the country, UnitedHealth's acquisition of Amedisys would eliminate a competing employer and thereby deprive nurses of valuable competition for pay and other employment terms. In short, vulnerable patients and valued nurses in each of these

4

local markets would have fewer choices for home health and hospice services (or for employment) because of the unlawful consolidation of two of the largest competing home health and hospice providers—UnitedHealth and Amedisys.

10.     Recognizing the illegal and anticompetitive impact of the proposed merger, Defendants propose to divest assets in hundreds of separate markets to VitalCaring Group ("VitalCaring").

11.     The proposed divestiture, however, will not eliminate the threat to competition presented by the merger. VitalCaring will not replace the competitive intensity lost by the merger. The company has operated for only three years, and the hodgepodge of assets that it would acquire would nearly double VitalCaring's size immediately. Not only does VitalCaring's quality lag behind both UnitedHealth and Amedisys, but several of VitalCaring's previously acquired assets saw quality decrease post-acquisition. VitalCaring's private equity investors have significantly written down their valuations of the company due to its poor financial performance.

12.     Worse still, VitalCaring faces a lawsuit in Delaware Chancery Court seeking nearly half-a-billion dollars stemming from its current CEO's alleged breaches of contractual and fiduciary duties while leading a rival home health and hospice provider, Encompass Home Health ("Encompass"). In a related action, a Texas state court held that while CEO of Encompass, VitalCaring's current CEO ran VitalCaring "from the shadows," and in violation of her contractual duties to Encompass.

13.     Even if VitalCaring were an adequate buyer, the divestiture does not resolve the competitive overlap in over 100 home health and hospice markets across 19 states and the District of Columbia, accounting for well in excess of $1 billion in total commerce. Nor does the divestiture address the harm to thousands of home health and hospice nurses in labor markets

across 18 states. And the divestiture creates a new presumptively anticompetitive and illegal overlap around Biloxi and Gulfport, Mississippi.

14.    In December 2023, as part of the proposed acquisition, Amedisys chose to certify that its submission complied with the Hart-Scott-Rodino Antitrust Improvements Act of 1976 ("HSR Act"). The production was not complete and did not include a statement identifying what was missing, as required by statute. Despite knowing about the infirmities of its production and the inaccuracy of its certification, Amedisys only attempted to rectify the issue months later, after the United States discovered the issues and notified the company of the multiple problems with its HSR Act compliance.

15.    Beyond the markets at issue here, this merger would also affect American healthcare more broadly. If UnitedHealth succeeds in buying one of its most significant competitors in these presumptively anticompetitive markets, the nation's three largest home health providers would be owned by the nation's two largest Medicare Advantage insurers— UnitedHealth, through LHC and Amedisys, and Humana, through Kindred (which Humana purchased in 2021). This merger would also further consolidate UnitedHealth's standing as the dominant force in nearly every corner of the American healthcare system. Over the past three years, UnitedHealth has spent more than $36 billion acquiring companies in a variety of healthcare settings, turning itself into the largest commercial health insurer in the United States; the largest employer of physicians; the second-largest pharmacy benefit manager; and one of the largest healthcare technology and service vendors.

16.    UnitedHealth's acquisition of Amedisys would ensure that UnitedHealth, not competition, would determine outcomes for patients in home health and hospice and for the nurses that provide those services in hundreds of local markets across the country.

17.     The vulnerable patients who receive vital home health and hospice services, as well as the nurses who provide those services, deserve the benefits of competition between UnitedHealth and Amedisys. Patients and nurses should not bear the risk of harm from the proposed merger. Nor should they have to accept the gamble that an unproven and struggling divestiture partner can replace the competition that the merger would eliminate.

18.     For these reasons, and those detailed below, UnitedHealth's proposed acquisition of Amedisys threatens to substantially lessen competition in local home health, hospice, and nurse labor markets throughout the country. As a result, the United States and the Attorneys General of Maryland, Illinois, New Jersey, and New York respectfully request that the Court enjoin the merger pursuant to Section 7 of the Clayton Act, 15 U.S.C. § 18. The United States also respectfully requests that the Court impose civil penalties on Amedisys for its failure to comply with the HSR Act.

## I.     HOME HEALTH AND HOSPICE PROVIDE CRITICAL CARE TO VULNERABLE PATIENTS

19.     Home health and hospice services allow millions of vulnerable Americans to rehabilitate, manage chronic conditions, or cope with the end of their lives where they are most comfortable—at home.

20.     Home health patients often need extra assistance after a recent hospitalization or are managing chronic conditions like heart failure, diabetes, lung disease, or dementia. Unsurprisingly, they often prefer to receive skilled nursing and therapy services in the comfort of their homes rather than in rehabilitation hospitals or nursing homes. Receiving care at home from skilled nurses and other healthcare professionals helps home health patients regain independence and enjoy the simple pleasures of life—"to walk outside, check the mail or pick up and hold their grandchild."

21.    Hospice services allow patients, usually seniors, who face terminal conditions such as cancer, heart failure, or lung disease, to enjoy the last days of their lives primarily in their own homes. Receiving nursing care, emotional support, therapy, and quality-of-life assistance in the familiarity of their homes allows hospice patients to spend their last days as pain-free and peacefully as possible. Hospice providers offer a wide range of services to support the physical, psychosocial, spiritual, and emotional needs of terminally ill patients and their family members. Hospice care is provided by interdisciplinary teams of doctors, nurses, therapists, aides, chaplains, counselors, social workers, and volunteers.

22.    Because these services are typically offered to patients in their homes, home health and hospice are fundamentally local businesses. Patients generally seek care from home health and hospice agencies that operate in the area around a patient's home. State laws and regulations often limit the areas in which home health and hospice providers can offer services. And providers, like UnitedHealth and Amedisys, tailor services to meet the needs of local populations and employ nurses who are within commuting distance of the patients they serve.

23.    Patients can receive home health services while enrolled either in traditional Medicare or Medicare Advantage. Traditional Medicare is a program administered by the Centers for Medicare and Medicaid Services ("CMS") for people aged 65 years or older, or people younger than 65 if they have a disability or specified diseases. By contrast, Medicare Advantage is a program administered by private insurance plans that is an alternative to traditional Medicare. Approximately half of Medicare-eligible patients use Medicare Advantage. Both CMS, which directly pays for services provided to patients enrolled in traditional Medicare, and Medicare Advantage insurers prefer that eligible patients use home health services for post-

acute care because doing so is significantly less expensive than receiving similar care provided in hospitals, rehabilitation centers, or skilled nursing facilities.

24.     With respect to hospice, traditional Medicare pays for nearly all hospice services provided in the United States, including for seniors who are otherwise covered by Medicare Advantage. Under Medicare, patients become eligible for hospice coverage once a doctor certifies that a patient has less than six months left to live, and the patient has chosen to stop any care that aims to cure their underlying disease or illness. This requirement distinguishes hospice from nearly all other healthcare services, which are curative and therefore not substitutes for hospice.

25.     Home health and hospice services rely on the ability and expertise of skilled nurses, among other specialists, to provide effective, high-quality, and personalized care. Home health and hospice nurses develop close and meaningful relationships with patients, which many nurses find particularly fulfilling. These nurses spend hours with patients in their homes to provide care and comfort, which can influence patients' recovery and satisfaction with care. Thus, patients benefit when home health and hospice providers attract high quality, compassionate nurses who can help improve patients' condition or care for them in their final days.

26.     Within home health and hospice, Medicare regulations and state licensure laws distinguish between two different types of nurses: registered nurses ("RNs") and licensed practical nurses or licensed vocational nurses ("LPN/LVNs").[1] As providers of basic medical care, LPN/LVNs are restricted in their scope of duties; they cannot perform initial assessments of

---

[1] Licensed practical nurses and licensed vocational nurses have the same responsibilities, educational preparation, roles, and skill sets, but the name of the position varies between states.

Case 3:25-mc-00010-DJH-RSE    Document 1-3    Filed 06/30/25    Page 11 of 43 PageID
#: 26
Case 1:24-cv-03267-JKB    Document 1    Filed 11/12/24    Page 10 of 42

patients or work without supervision. By contrast, home health and hospice RNs can perform more advanced clinical duties; they conduct specific types of visits, coordinate care, and supervise other members of a patient's care team, including LPN/LVNs.

27.    Home health and hospice nursing differ substantially from other types of nursing. Many home health and hospice nurses prefer to remain in home health and hospice rather than move to a different specialty. Compared to many other types of nursing, home health and hospice typically involve fewer and more flexible hours and greater independence, especially compared to the rigid shifts often required in hospitals. Further, home health and hospice nurses may find their work less hectic than treating acute-care patients in hospitals. And hospice nurses, unlike those in other specialties (including home health), focus on the care, comfort, and quality of life of terminal patients instead of curing these patients. In so doing, they bring compassion to the emotionally taxing circumstances of working with terminally ill patients. Many hospice nurses feel a specific "calling" to the field. Hospice nursing is "a hard role to fill," given that the job is "fundamentally helping people die."

28.    Nursing positions in hospitals differ substantially from home health and hospice nursing positions. Hospital nurses work at a fixed location and work side-by-side with doctors and other nurses to provide round-the-clock care; conversely, home health and hospice nurses travel to patients' homes and largely work alone. In the fast-paced and often unpredictable hospital environment, acute-care nurses tend to numerous, very sick patients whose conditions can quickly deteriorate, whereas home health and hospice nurses visit patients who are stable enough to be at home. RNs in hospitals also tend to earn significantly more than RNs working in home health and hospice.

## II.    UNITEDHEALTH AND AMEDISYS COMPETE VIGOROUSLY TO PROVIDE HOME HEALTH AND HOSPICE SERVICES

### A.    UnitedHealth and Amedisys Are Two of the Three Largest Home Health and Hospice Providers in the United States

29.    UnitedHealth is a vertically integrated healthcare behemoth and the fifth-largest company in the United States, with revenues of $372 billion in 2023. By 2022, it concluded that home healthcare—including home health and hospice—would "grow exponentially as the baby boom ages and as Millennials move into older cohorts," and thus folded LHC into its Optum Health business after acquiring LHC in February 2023. LHC itself grew by rolling up rival home health and hospice providers, acquiring 44 home health or hospice companies across more than 20 states from 2020 to 2023. Through LHC, UnitedHealth now operates over 530 home health locations and over 120 hospice locations, and employs more than 5,000 nurses who provide home health and hospice services. In 2022, LHC collected around $2.3 billion in revenue, making about 12 million visits annually to patients in 37 states and the District of Columbia.

30.    As of 2023, Amedisys is the third-largest provider of both home health and hospice services in the United States. In 2023, Amedisys earned $2.2 billion in revenue and provided 10.6 million visits to patients in 37 states and the District of Columbia. Like UnitedHealth, Amedisys has grown through acquisitions, having spent more than $1 billion on acquisitions since 2019. Currently, Amedisys operates over 340 home health locations and over 160 hospice locations, and employs over 3,600 nurses who provide home health and hospice services.

### B.    UnitedHealth and Amedisys Are Significant Competitors in Home Health and Hospice Services

31.    As two of the largest home health providers, UnitedHealth and Amedisys compete head-to-head in many local markets. Before UnitedHealth's acquisition of LHC, Amedisys's

former CEO remarked that LHC was "defined by [Amedisys] and will have to keep up with [Amedisys]." Amedisys strategizes to "tak[e] share" and "steal" share from UnitedHealth in local markets, even monitoring UnitedHealth/LHC's expansion following acquisitions.[2] After UnitedHealth announced its acquisition of LHC in 2023, Amedisys's senior executives told investors that this purchase gave Amedisys a chance to steal share from LHC in overlapping markets. Likewise, UnitedHealth competes to "stand out from" and "put a dent in" Amedisys. UnitedHealth/LHC found it "very frustrating" that Amedisys had "gain[ed] on us" in local markets and lamented "being second choice" to Amedisys.

32.    UnitedHealth and Amedisys consistently identify each other as significant home health competitors. They carefully monitor each other's initiatives and performance in home health, and UnitedHealth relishes opportunities to make "competitive move[s] to block Amedisys."

33.    UnitedHealth and Amedisys acknowledge that they also compete directly in local markets to provide hospice services. They monitor each other's earnings calls and financial performance for information about each other's hospice businesses. UnitedHealth notes when Amedisys's hospice business is "kicking [UnitedHealth's] teeth in" and when its hospice earnings lag behind those of Amedisys. UnitedHealth also monitors Amedisys's hospice acquisitions and, in one instance, expressed concern about Amedisys purchasing a hospice agency because "Amedisys does a lot of things that we do not do—if they get a foothold in [the] county, they will likely push us out." Amedisys similarly tracks UnitedHealth on numerous metrics, including UnitedHealth's hospice admissions and service offerings.

---

[2] For clarity, "UnitedHealth/LHC" is used only in the context of actions taken by LHC before being acquired by UnitedHealth. After that acquisition, LHC is another subsidiary in UnitedHealth's holdings, and is accordingly encompassed in the definition of "UnitedHealth."

**C.    UnitedHealth and Amedisys Compete on Quality and Service Offerings in Home Health and Hospice**

34.    To win patients, home health and hospice providers distinguish themselves on numerous factors, including quality of care and service offered to patients. Although efforts to increase or maintain quality and service are costly, higher quality and better service allow UnitedHealth and Amedisys to attract patients directly and to appeal to healthcare providers for patient referrals. As the CEO of UnitedHealth's LHC acknowledged, quality is "critically important" in these industries: "everything is kind of focused and geared towards ensuring we're the highest quality provider[] generating the best outcomes that we can."

35.    Home health and hospice providers, including UnitedHealth and Amedisys, receive most of their patients through referrals from other healthcare providers, such as hospitals, physician practices, and skilled nursing facilities. These referral sources identify which patients in their care need home health or hospice services and often provide information to patients and their families to help them select a provider. UnitedHealth and Amedisys compete head-to-head for referrals, tracking each other's strategies and responding to each other's strategic decisions with the goal of stealing share. For home health services, companies with more capacity can get more referrals (and thus more share) because they can accept more patients. Accordingly, their significant capacity differentiates UnitedHealth and Amedisys from smaller companies with less capacity. Indeed, in the words of Amedisys's former CEO and current chairman, "[t]he winners in our world will be those companies that have the capacity to fulfill the demand."

36.    In home health, UnitedHealth and Amedisys compete on a variety of quality dimensions, including delivering better clinical outcomes and lower readmission rates to hospitals and skilled nursing facilities. One quality metric considered by patients and by referral sources when guiding patients are CMS's "star ratings," comprised of CMS-published reports

13

summarizing how individual home health agencies perform on various measures in aggregated fashion. CMS also makes star ratings available on its "Care Compare" website, which patients can consult when researching home health providers in their local area. Both UnitedHealth and Amedisys compete against one another for higher star ratings. As Amedisys's former CEO and current Board Chairman explained, high star ratings equate to a "[r]eferrals increase" and improvements in "[v]olume and revenues," since patients "flock[] to care centers with higher Medicare Star Ratings."

37.     CMS quality metrics are also a dimension of competition in hospice. CMS tracks individual hospice provider locations on a variety of metrics representing hospice quality. These quality metrics cover processes at the time of admission, care processes during the hospice period, and the quantity of care provided in a patient's last few days. CMS also surveys the family caregivers of patients who died while under hospice care. This survey is used to create hospice-specific star ratings, which have been published along with other hospice quality measures on CMS's Care Compare website since August 2022.

38.     In both home health and hospice, UnitedHealth and Amedisys compete to obtain high quality scores from CMS. As a result, the two companies constantly compare their quality scores and compete for improved scores, celebrating when their respective numbers increase and the other's do not. When Amedisys has higher scores on CMS measures, UnitedHealth endeavors to raise its own scores in response, and UnitedHealth's sales representatives tout higher CMS quality scores as a differentiator from other providers, including Amedisys. For its part, Amedisys arms its sales representatives with its CMS quality scores emblazoned on customized marketing materials.

39.     In addition to competing on quality metrics, UnitedHealth and Amedisys laud their ability to admit home health patients quickly, a fact valuable to both patients and referral sources. Defendants also offer specialty home health programs tailored to specific patients. For example, Defendants develop programs aimed at managing specific conditions, such as heart failure or respiratory disease, and deploy them in local areas where those conditions are prevalent. Further, they compete by offering patients more touchpoints with clinicians outside of in-home visits, such as having their staff call patients to follow up. These efforts can meet additional patient needs and drive better patient outcomes, manifesting, for instance, in lower hospital readmission rates. Many of Defendants' smaller, local competitors lack the resources to invest in larger workforces and programs, such as local quality improvement coordinators, that create these advantages.

40.     Similarly, in hospice, Defendants strive to admit patients quickly and offer specialty programs tailored to specific hospice patients—such as veterans or those suffering from dementia, heart failure, or pulmonary conditions, as well as therapies and services not covered by the Medicare hospice benefit. They also compete by offering palliative care, which focuses on relieving the symptoms of serious illness. Palliative care can be a gateway for patients who may need hospice in the near future and is another way that UnitedHealth and Amedisys generate hospice referrals. UnitedHealth considers adding palliative care programs—which are generally not profitable standing alone—in locations where it would help its local hospice provider compete and considers palliative care a "HUGE differentiator" for its hospice business. As with home health services, UnitedHealth and Amedisys can invest in these types of hospice-specific programs to a degree that their smaller competitors typically cannot match.

**D.    UnitedHealth and Amedisys Compete on Price and Quality to Provide Home Health Services to Medicare Advantage Insurers**

41.    Home health providers like UnitedHealth and Amedisys also compete on price and quality to be in-network with third-party Medicare Advantage plans. CMS pays private insurers a set amount for each member enrolled in the insurer's Medicare Advantage plan. In turn, the plans want to increase profits, improve benefits for their members, and offer low premiums, which they can do by controlling the costs of third-party medical providers such as home health agencies. Medicare Advantage insurers must include coverage for home health services in their insurance offerings.

42.    To reduce the costs of these services, Medicare Advantage insurers seek out favorable rates and terms when contracting with home health providers to deliver services across the local areas where their members reside. Medicare Advantage insurers' members pay less for in-network home health services than for out-of-network services; as a result, in-network home health providers are likely to attract more members from an insurer than are out-of-network providers. These dynamics drive home health providers, including UnitedHealth and Amedisys, to compete by offering lower rates and better terms to third-party Medicare Advantage insurers for inclusion in insurers' networks. Amedisys, for example, acknowledges that rates with Medicare Advantage plans are "driven down by price competition." UnitedHealth's insurance arm acts accordingly, as it has attempted to resist rate increases from Amedisys for UnitedHealth's own insurance plans by "cit[ing] that [Amedisys's] rates are in line with another national provider with a similar footprint (most likely LHC Group)."

**E.    UnitedHealth and Amedisys Compete to Hire and Retain Home Health and Hospice Nurses, Including Those with Experience in These Fields**

43.    Today, Defendants employ thousands of home health and hospice nurses and compete intensely to hire and retain them. Both companies must continuously hire new nurses to

16

Case 3:25-mc-00010-DJH-RSE    Document 1-3    Filed 06/30/25    Page 18 of 43 PageID
#: 33
Case 1:24-cv-03267-JKB    Document 1    Filed 11/12/24    Page 17 of 42

expand their presence and to replace nurses who leave. Home health and hospice nurses can play

UnitedHealth and Amedisys off each other during hiring negotiations, resulting in higher pay or

better conditions of employment.

44.    UnitedHealth and Amedisys consider each other close, substantial competitors in

recruiting home health and hospice nurses. UnitedHealth/LHC identified Amedisys as one of its

"[m]ain 3" competitors to assess when preparing a report on the value proposition for its home

health and hospice employees. UnitedHealth also compares itself to Amedisys on other facets,

including working culture, diversity and inclusion, application process, and Glassdoor ratings.

Likewise, Amedisys "compare[s] recruiting strategies with close competitors," including

UnitedHealth.

45.    As direct competitors, UnitedHealth and Amedisys try to recruit each other's

nurses. For example, UnitedHealth/LHC developed a recruitment plan to target Amedisys's

home health and hospice nurses in the Northeast and Midwest. UnitedHealth and Amedisys have

also tried to poach each other's nurses following acquisitions, leadership changes, and other

major company events. For instance, a UnitedHealth/LHC Vice President of Clinical Support

worried, "[w]ell I can[']t have [Amedisys] competing with my team. . . . I have 40 more people

to hire and I don't want Amed[isys] to take them!" Conversely, after UnitedHealth announced its

acquisition of LHC, Amedisys believed that LHC's impending ownership by UnitedHealth

created the "potential opportunity to grab LHC employees as a result of their acquisition" and

sent out a mass email to all LHC employees it had on record "targeting them in all [of

Amedisys's] activities!!"

46.    In response to this competition for nurses, UnitedHealth and Amedisys have

increased compensation. For example, UnitedHealth retained a nurse who planned to leave for

Case 3:25-mc-00010-DJH-RSE    Document 1-3    Filed 06/30/25    Page 19 of 43 PageID
#: 34
Case 1:24-cv-03267-JKB    Document 1    Filed 11/12/24    Page 18 of 42

Amedisys by offering her a "market match" to increase her pay. Similarly, Amedisys increased

its sign-on bonus for a nurse position in Lafayette, Louisiana, after hearing that UnitedHealth

was offering a higher bonus, and in Chattanooga, Tennessee, Amedisys offered a $10,000

retention bonus to keep a home health nurse in Amedisys's "endless battle with LHC" for the

highest quality nurses.

47.     To ensure their benefit offerings remain competitive, UnitedHealth and Amedisys

each track the benefits that the other offers its home health and hospice nurses. UnitedHealth

compares its health insurance premiums to Amedisys's to provide "a competitive benefits

package for [its] employees," and tracks Amedisys's provision of fleet cars—a highly desirable

benefit for some home health and hospice nurses, who travel frequently as part of their job. In

turn, Amedisys compares its full suite of benefits—including health insurance, disability

insurance, paid leave, and 401(k) matches—to UnitedHealth's when setting its benefits package.

## III.    THE PROPOSED ACQUISITION THREATENS TO SUBTANTIALLY LESSEN COMPETITION FOR HOME HEALTH, HOSPICE, AND NURSE EMPLOYMENT

48.     UnitedHealth's proposed acquisition of Amedisys would be the largest and most

significant instance of a trend towards concentration in the home health and hospice markets.

This proposed acquisition, on its own terms, threatens to substantially lessen competition in

hundreds of local markets for home health or hospice services across the country. It would

eliminate the fierce head-to-head competition between UnitedHealth and Amedisys that has

improved home health and hospice quality and service, helped control home health costs for

Medicare Advantage plans, and enhanced compensation and other employment terms for the

nurses critical to providing care in these markets.

49.     The proposed acquisition would eliminate the benefits of competition between

UnitedHealth and Amedisys. Quality and service would likely either deteriorate or improve more

slowly without that competition. UnitedHealth's competitors, many of whom lack the quality, capacity, or resources to compete with UnitedHealth as robustly as Amedisys can, are unable to replace that lost competition. Further, given the high demand for home health services, there are many local areas in which smaller home health providers frequently cannot accept new patients. In these capacity-constrained markets, patients in the local area cannot be placed into home health, and insurers may struggle to control their costs. Combining UnitedHealth and Amedisys—two of the three largest home health providers with substantial capacity to accept new patients and provide high-quality care—would give UnitedHealth significant and additional bargaining leverage with third-party Medicare Advantage insurers and enable UnitedHealth to command higher reimbursement rates.

50.     So, too, the acquisition threatens to substantially lessen competition in the employment prospects, compensation, and other employment terms for home health nurses and hospice nurses. Today, these nurses benefit from direct competition between UnitedHealth and Amedisys to employ them; the complete loss of that competition that would inevitably follow this merger would harm them as well. Experienced home health and hospice nurses, many of whom prefer the unique attributes of home health and hospice nursing, would likely be directly and negatively impacted by the diminished labor-market competition between Defendants.

51.     In addition to the elimination of beneficial head-to-head competition, in hundreds of local markets for home health services, hospice services, and nursing employment, UnitedHealth's post-merger market share and concentration levels would be so high that the proposed merger is presumptively anticompetitive and illegal.

### A.     Relevant Markets for Home Health Services

#### 1.     Home Health Is a Relevant Service Market

52.     Home health services is a relevant service market, and the sale of those services to Medicare Advantage plans is also a relevant service market. In Medicare Advantage markets, insurers negotiate on price with home health providers, unlike in traditional Medicare markets, where CMS sets compensation rates for home health providers.

53.     Most patients who can receive home health services prefer to do so rather than remain in an inpatient facility. As well, both CMS and Medicare Advantage insurers recognize that, in addition to satisfying patient demand, home health services are cost effective relative to inpatient or post-acute care received in a facility. UnitedHealth, Amedisys, and other industry participants treat home health services as distinct from other healthcare services when organizing and reporting on their businesses, and CMS has distinct criteria, often mirrored by Medicare Advantage insurers, that providers and patients must meet to offer or receive home health services.

54.     Home health services are used predominantly by patients who are insured by Medicare, either through traditional Medicare or Medicare Advantage plans. For traditional Medicare, home health providers are reimbursed for services provided to patients at non-negotiable rates set by statute and by regulations promulgated by CMS. In contrast to traditional Medicare, Medicare Advantage insurers negotiate with home health providers on rates and terms. Unlike traditional Medicare, patients covered by Medicare Advantage, who often have lower than average incomes, may receive a more limited number of home health visits, owe a co-pay or co-insurance for home health services, and can be restricted to home health providers in their insurer's network. These practical indicia and market realities establish that home health services is a relevant services market.

20

55.     Home health services satisfy the well-accepted "hypothetical monopolist" test set forth in the DOJ and Federal Trade Commission's ("FTC") *Merger Guidelines*.[3] The hypothetical monopolist test helps determine if a group of products or services is sufficiently broad to be a properly defined antitrust market. If a single firm (i.e., a hypothetical monopolist) that controlled all sellers of a set of products or services would impose a small but significant and non-transitory increase in price ("SSNIP") or other worsening of terms ("SSNIPT") without losing sufficient customers to make the SSNIP or SSNIPT unprofitable, then that group of products or services is a properly defined antitrust product or service market.

56.     Home health services satisfy the hypothetical monopolist test. Patients would not substitute to other healthcare services (for example, receiving post-acute care in a hospital) to deter a hypothetical monopolist of home health services from imposing a SSNIPT.

57.     Similarly, home health services sold to Medicare Advantage insurers satisfy the hypothetical monopolist test. Medicare Advantage insurers and their members would not substitute to other healthcare services in sufficient numbers to deter a hypothetical monopolist of home health services from imposing a SSNIP or SSNIPT.[4]

   2.     *Local Areas Where Patients Are Treated Constitute Relevant Geographic Markets for Home Health Services*

58.     Home health patients receive care in their homes from professionals who travel to them. In turn, those professionals typically travel within areas that are a reasonable commute to the home health patients that they serve and the offices of the agencies that employ them. So, patients seeking home health services can only practicably turn to agencies who have offices and

---

[3] Dep't of Justice & Fed. Trade Comm'n, Merger Guidelines (2023), available at
https://www.justice.gov/atr/merger-guidelines.
[4] In the alternative, even if home health services provided to traditional Medicare patients were analyzed as a separate relevant service market, the proposed acquisition is unlawful.

Case 3:25-mc-00010-DJH-RSE     Document 1-3     Filed 06/30/25     Page 23 of 43 PageID
#: 38
Case 1:24-cv-03267-JKB     Document 1     Filed 11/12/24     Page 22 of 42

offer services where those patients live. Medicare Advantage insurers—who market and sell
their insurance plans at the county level—require in-network home health agencies in the local
areas where their members live. Moreover, in many areas, laws and regulations, such as
certificate of need laws, limit the geographic area that a home health provider can serve. As a
result, competition to serve patients primarily occurs locally.

59.     Localized markets where UnitedHealth or Amedisys treat home health patients
are relevant geographic markets in which to assess the competitive effects of the proposed
acquisition. A hypothetical monopolist of home health services in each localized geography
would profitably impose a SSNIPT (for example, provide fewer services) or, for Medicare
Advantage plans, either a SSNIP (for example, higher rates) or a SSNIPT.

3.     *The Proposed Acquisition Is Presumptively Anticompetitive and Illegal in
Hundreds of Home Health Markets*

60.     Under controlling law, the merger would increase concentration enough to render
it presumptively anticompetitive and illegal. *See United States v. Phila. Nat'l Bank*, 374 U.S.
321, 362–64 (1963); *Merger Guidelines*, § 5.3. The proposed acquisition would result in a
presumptively unlawful increase in concentration in hundreds of local home health markets, and
local markets for home health services sold to Medicare Advantage plans, in at least 23 states
and the District of Columbia. Appendix A is a non-exhaustive list of Defendants' home health
locations in markets that, after the proposed merger, would become highly concentrated and in
which anticompetitive effects can therefore be presumed. The proposed merger is presumptively
unlawful in all of these markets. In some of these local markets, Defendants' post-merger share
would reach monopoly levels. For example, in Maryland's Eastern Shore, UnitedHealth would
control more than 75% of home health services provided to traditional Medicare and Medicare

Advantage patients. Under any plausible geographic market definition, the volume of commerce in presumptively unlawful home health markets is at least $1.6 billion annually.

### B.    Relevant Markets for Hospice Services

#### 1.    *Hospice Services Provided to Medicare Beneficiaries Is a Relevant Service Market*

61.     Traditional Medicare covers the vast majority of hospice services in the United States. For hospice providers to be reimbursed by traditional Medicare, their services must satisfy distinct CMS regulations unique to hospice. Defendants and other industry participants regard hospice services as distinct from other healthcare services in how they organize and report on their businesses. These practical indicia and market realities establish that hospice services provided to Medicare patients is a relevant service market.

62.     A hypothetical monopolist of hospice services provided to traditional Medicare patients would likely impose a SSNIPT without losing sales sufficient to make its worsened terms, including decreased quality or service, unprofitable. In the face of a SSNIPT, traditional Medicare patients would continue to require hospice services, and patients would not shift to services other than hospice in sufficient numbers to make the SSNIPT unprofitable.

#### 2.    *Local Areas Where Patients Are Treated Constitute Relevant Geographic Markets for Hospice Services*

63.     Hospice patients typically receive care in their homes from caregivers who travel to them. And, in turn, those hospice caregivers typically travel within areas that are a reasonable commute to the hospice patients that they serve and the offices of the agencies that employ them. So, patients seeking hospice care can only practicably turn to agencies who have offices and offer services where those patients live. As with home health, in many areas, certificate of need laws, other laws, or regulations limit the geographic area that a hospice provider can serve. Hospice competition therefore primarily occurs locally.

64.     Localized markets where UnitedHealth or Amedisys treat hospice patients are relevant geographic markets in which to assess the competitive effects of the proposed acquisition. A hypothetical monopolist of all hospice services provided to traditional Medicare patients in each localized market would profitably impose a SSNIPT.

    *3.    The Proposed Acquisition Is Presumptively Anticompetitive and Illegal in Dozens of Hospice Markets*

65.     The proposed acquisition would result in a presumptively unlawful increase in concentration in dozens of hospice markets in at least eight states. Appendix B is a non-exhaustive list of Defendants' hospice locations in markets that, after the proposed merger, would become highly concentrated and in which anticompetitive effects can therefore be presumed. The merger is presumptively unlawful in all of these markets.

66.     As with home health, UnitedHealth's acquisition of Amedisys would result in near-monopoly shares in some local markets. In the area of Parkersburg, West Virginia, for example, after the transaction, UnitedHealth would control more than 90% of hospice services provided to traditional Medicare patients. Under any plausible geographic market definition, the volume of commerce in presumptively unlawful hospice markets is at least $300 million annually.

**C.    Relevant Markets for the Labor of Home Health and Hospice Nurses**

    *1.    Home Health and Hospice Nurses Are Relevant Labor Markets*

67.     RNs and LPN/LVNs working in home health are each a relevant labor market. RNs working in hospice constitute a separate relevant labor market. The characteristics of home health and hospice work distinguish the nurses who work in these markets from one another, as well as from nurses who work in other healthcare settings. Home health and hospice nursing each involve providing different services to treat different patients in their homes and offer

different compensation and working conditions from each other and from other nursing opportunities. Both nurses and employers recognize that home health and hospice nursing have different characteristics from nursing services provided in other settings. These practical indicia and market realities establish that both employment for home health nurses and hospice nurses are each relevant labor markets.

68.    A hypothetical monopsonist employer (i.e., a monopolist purchaser of labor) of either home health or hospice nurses would be able to impose a SSNIPT in the form of lower wages, worse benefits or other employment terms, or worse working conditions. Not enough home health or hospice nurses would shift to alternative forms of nursing to make a SSNIPT unprofitable.

### 2.    The Relevant Geographic Markets for Nurse Labor Are Local

69.    Nurses who work in home health or hospice settings commute to multiple patients each day and to the offices of the agencies that employ them. Thus, the areas where they offer services must be within a reasonable distance of their homes. This means that home health and hospice nurses can only practicably turn to alternative employers who have offices and serve patients residing within a reasonable commuting distance. As a result, the relevant geographic markets for home health and hospice nurse labor are the county or set of counties where a predominant number of nurses reside who are willing to commute to the patients of UnitedHealth or Amedisys for their home health or hospice locations. A hypothetical monopsonist in each of the local markets for home health and hospice nurses would profitably impose a SSNIPT. In response to a SSNIPT, home health and hospice nurses are unlikely to relocate themselves (and potentially their families) outside of their local area to work for another home health or hospice provider or to leave either home health or hospice employment.

       3.    *The Transaction Is Presumptively Anticompetitive and Illegal in Hundreds of Labor Markets*

70.    The proposed acquisition would result in a presumptively unlawful increase in concentration in hundreds of local labor markets in at least 24 states. Appendix C is a non-exhaustive list of Defendants' locations in markets in which the transaction would result in a significantly increased concentration for the employment of home health and hospice nurses. In each of these markets, UnitedHealth's proposed acquisition of Amedisys is presumptively unlawful. UnitedHealth's acquisition of Amedisys would cause the combined firm to have near total monopsony shares in several markets. For example, in Maryland's Eastern Shore, after the transaction, UnitedHealth would employ more than 70% of both home health RNs and LPN/LVNs. Under any plausible geographic market definition, the presumptively unlawful labor markets would impact at least 8,000 nurses.

## IV.   DEFENDANTS' PROPOSED DIVESTITURES FAIL TO ELIMINATE THE PROPOSED ACQUISITION'S THREAT TO COMPETITION

71.    For some markets in which the proposed transaction results in presumptively unlawful increases in concentration, UnitedHealth proposes to divest home health and hospice locations to a much smaller competitor, VitalCaring. But VitalCaring is unlikely to replace the competition that would be lost by UnitedHealth's acquisition of Amedisys, or eliminate the threat to competition the acquisition poses; VitalCaring is an unproven company with only three years of operational experience, poor financial performance, and potentially catastrophic legal exposure.

72.    Unlike Defendants' successful home health and hospice businesses, VitalCaring has struggled. Founded in 2021, VitalCaring is owned equally by two private equity firms, The Vistria Group ("Vistria") and Nautic Partners ("Nautic"), as well as VitalCaring's current CEO. To date, VitalCaring's business, which consists of 57 home health and 7 hospice locations in six

Case 3:25-mc-00010-DJH-RSE     Document 1-3     Filed 06/30/25     Page 28 of 43 PageID
#: 43
Case 1:24-cv-03267-JKB     Document 1     Filed 11/12/24     Page 27 of 42

states in the southeastern United States, performs less than a million visits annually and has
continued to underperform financially. VitalCaring's valuation has plummeted since the end of
2021, and its two private equity owners have significantly written down their investments in the
company. If the merger is consummated and the divestiture occurs, VitalCaring would acquire—
and need to successfully integrate—mix-and-match assets that would double its current size, as
well as begin providing services in new local markets in many states where it has no current
presence, all in order to have any hope of matching Defendants' present services. VitalCaring's
quality metrics also fall short of both Defendants', and, after acquisition by VitalCaring, other
providers saw their quality scores decline.

73.     Worse still, VitalCaring faces significant liability stemming from Ms. Anthony's
alleged breaches of her fiduciary duties to her former employer, rival Encompass (now Enhabit).
A Texas state court found in 2022 that VitalCaring's current CEO violated her contractual
obligations to Encompass. Specifically, that while CEO of Encompass, she clandestinely worked
with Nautic and Vistria "from the shadows" to form VitalCaring before she formally joined it,
poaching many of Encompass's employees in the process. These same facts underpin Enhabit's
pending lawsuit filed in the Delaware Court of Chancery against VitalCaring, several of its
executives and directors, and its private-equity sponsors for aiding Ms. Anthony's alleged
breaches of her fiduciary duties. Enhabit seeks nearly half a billion dollars in damages, and a
decision in the case is expected any day. An adverse judgment in this lawsuit could imperil
VitalCaring's corporate viability or its ability to operate the divested assets with the competitive
intensity sufficient to replace the competition lost from Defendants' unlawful merger.

74.     Apart from VitalCaring's inadequacies that draw into question whether a
divestiture of any assets to it could be successful, UnitedHealth's divestiture would still leave

over 100 home health, hospice, and nurse labor markets unremedied. UnitedHealth's acquisition of Amedisys would increase concentration in these markets to levels at which anticompetitive effects are presumed and the transaction is unlawful. These unremedied markets annually generate at least a billion dollars in revenue and serve at least 200,000 patients; they also employ at least 4,000 nurses.

75.     Further, UnitedHealth's proposed divestiture would also create an additional anticompetitive overlap in the area of Biloxi and Gulfport, Mississippi. In this market, VitalCaring's acquisition of divestiture assets would increase concentration to a level that is presumptively unlawful.

## V.      NO COUNTERVAILING FACTORS REBUT THE PRESUMPTION OF COMPETITIVE HARM FROM THE PROPOSED ACQUISITION

76.     Entry or expansion by other home health and hospice providers would not alleviate the substantial harm to competition threatened by this proposed merger. Home health and hospice markets feature high barriers to entry and expansion. Among other barriers to entry, laws and regulations, such as certificate of need laws, prevent or significantly delay new entry in many areas. UnitedHealth's and Amedisys's strategies of growth by acquiring other home health and hospice providers reflect the difficulty of entry or expansion in home health and hospice services.

77.     In addition, the merger is unlikely to generate verifiable, merger-specific efficiencies in the relevant markets, let alone enough to sufficiently prevent or outweigh the significant anticompetitive effects that are likely to occur.

## VI.    AMEDISYS VIOLATED SECTION 7A OF THE CLAYTON ACT

### A.    The HSR Act and HSR Rules

78.    The HSR Act, also known as Section 7A of the Clayton Act, 15 U.S.C. § 18a, is an essential part of modern antitrust enforcement. Among other things, it requires the buyer and seller of voting securities or assets above a certain value[5] to notify the DOJ's Antitrust Division and the FTC prior to consummating the acquisition, so as to provide the agencies with sufficient opportunity to review proposed transactions and to determine whether to seek an injunction to prevent transactions that may violate the antitrust laws.

79.    Section 7A(e) of the HSR Act authorizes the investigating agency to require merging parties to produce "additional information or documentary material relevant to the proposed acquisition." 15 U.S.C. § 18a(e)(1)(A). Demands for information under Section 7A(e) are commonly known as "Second Requests." Second Requests prevent the parties from closing their transaction until 30 days after the parties have provided the investigating agency with "all the information and documentary material" requested. 15 U.S.C. § 18a(e)(2)(A). A party that does not provide all materials required by the Second Request must provide "a statement of the reasons for such noncompliance." 15 U.S.C. § 18a(e)(2)(B). The FTC, with the concurrence of the Antitrust Division, is authorized to promulgate rules defining terms used in the Act and other rules that are necessary and appropriate to carry out the purposes of the notification and waiting period provisions. 15 U.S.C. § 18a(d)(2). The HSR Act Rules are promulgated at 16 C.F.R. §§ 801–803.

80.    For transactions such as the proposed acquisition of Amedisys, the waiting period ends 30 days after a party provides all the information required by the Second Request or

---

[5] UnitedHealth's $3.3 billion acquisition of Amedisys is subject to the HSR Act's notification requirements.

provides a partial response along with a statement of reasons for noncompliance. 15 U.S.C.

§§ 18a(b)(1)(B), (e)(2)(b). Accordingly, the HSR Rules require that a party's final submission in

response to a Second Request be accompanied by a certification attesting that the information

provided is "true, correct, and complete in accordance with the statute and rules." 16 C.F.R.

§ 803.6(a)(2), (b); Notification and Report Form, appendix to 16 C.F.R. pt. 803.

81.    Under Section 7A(g) of the Clayton Act, 15 U.S.C. § 18a(g), a corporation that

fails to comply with the HSR Act is liable to the United States for a civil penalty for each day it

is in violation. The maximum amount of civil penalty during the period relevant to this

Complaint was $51,744 per day. Federal Civil Penalties Inflation Adjustment Act of 2015, Pub.

L. 114-74 § 701 (further amending the Federal Civil Penalties Inflation Adjustment Act of

1990); Rule 1.98, 16 C.F.R. § 1.98, 89 Fed. Reg. 1,445 (Jan. 10, 2024).

**B.    Despite Providing an Erroneous and Inaccurate Submission, Amedisys Certified That It Was Complete and Did Not Identify What Was Missing**

82.    On July 5, 2023, UnitedHealth and Amedisys filed HSR notifications with the

FTC and the Antitrust Division. On August 4, 2023, the Antitrust Division issued Second

Requests to UnitedHealth and Amedisys requiring documents, data, and information about the

companies, the industry, and the merger. These Second Requests included detailed instructions

for compliance. If any responsive documents or information had been lost or destroyed, Section

(e)(2)(B) of the HSR Act, Section 803.3 of the HSR Rules, and Instruction 15 of the Second

Requests required each Defendant to inform the Antitrust Division and explain what happened.

83.    In summer 2023, Amedisys first became aware of a potential problem with the

email archiving system that it relied on to maintain documents related to litigation or responsive

to regulatory requests. This problem persisted for an approximately 30-day period between May–

June 2023, coinciding with UnitedHealth and Amedisys's negotiation of their proposed merger.

Case 3:25-mc-00010-DJH-RSE     Document 1-3     Filed 06/30/25     Page 32 of 43 PageID
#: 47
Case 1:24-cv-03267-JKB     Document 1     Filed 11/12/24     Page 31 of 42

After discovery of the problem with the email archiving system, the May–June 2023 emails were
not recovered from that system, and the issue remained unresolved by the vendor on December
18, 2023.

84.     On December 18, 2023, Amedisys certified that that it had complied with its
Second Request and that its response was "true, correct, and complete in accordance with the
statute and rules" as required by Section 803.6 of the HSR Rules. But that certification was
erroneous and inaccurate because Amedisys failed to provide a statement of reasons for its
partial compliance with the Second Request and to disclose the missing emails from May–June
2023, during which UnitedHealth and Amedisys were negotiating the proposed merger.

85.     Amedisys also failed to produce any hard copy documents from any custodian
prior to its December 18, 2023 certification, despite Amedisys's knowledge of the existence of
such hard copy documents. For example, in his June 2023 book, Amedisys's former CEO and
current Chairman of the Board touted his copious handwritten notes about his "Amedisys
journey."

86.     Amedisys also knew of, but failed to produce, text messages for over half of its
custodians prior to its December 18, 2023 certification. In a few instances, some text messages
called for by the Second Request may have been permanently lost.

87.     Amedisys did not acknowledge its deficiencies until the Division found and
presented evidence of them. For over eight months after its erroneous and inaccurate December
18, 2023 certification, Amedisys produced more than 2.5 million additional documents—
including hundreds of thousands of emails, hard copy documents, and text messages that pre-
dated its December 18, 2023 certification—to complete its response to the Second Request.
These post-December 18, 2023 productions represent a greater volume of documents than

Case 3:25-mc-00010-DJH-RSE    Document 1-3    Filed 06/30/25    Page 33 of 43 PageID
#: 48
Case 1:24-cv-03267-JKB    Document 1    Filed 11/12/24    Page 32 of 42

Amedisys produced before certifying compliance with the Second Request on December 18, 2023. And these belated productions included materials from earlier in 2023 that were clearly relevant to the potential impact of this merger on competition in the markets for home health and hospice services and for nurses' labor. They included, for example: an email from Amedisys's current CEO to other C-Suite executives debating the risks related to the transaction and likely divestitures; a text message from Amedisys's Senior Vice President of Revenue Cycle Management discussing how UnitedHealth is "[l]ocking up the home health and hospice market in many locations;" and a hard copy document from Amedisys's Chief Financial Officer and Chief Operating Officer describing UnitedHealth's offer as "opportunistic."

88.    More than eight months after its erroneous and inaccurate certification, on August 26, 2024, Amedisys submitted a second certification in accordance with Section 803.6 of the Rules attesting compliance with its Second Request.

89.    Amedisys was continuously in violation of the requirements of the HSR Act each day beginning on December 18, 2023, until it submitted a second certification attesting that it had submitted a complete response to its Second Request on August 26, 2024.

## VII.    <u>JURISDICTION AND VENUE</u>

90.    Plaintiff United States brings this action pursuant to Section 15 of the Clayton Act, 15 U.S.C. § 25, to restrain Defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18.

91.    Plaintiff States, by and through their respective Attorneys General, bring this action in their respective sovereign capacities and as *parens patriae* on behalf of the citizens, general welfare, and economy of their respective States under their statutory, equitable, or

Case 3:25-mc-00010-DJH-RSE    Document 1-3    Filed 06/30/25    Page 34 of 43 PageID
#: 49
Case 1:24-cv-03267-JKB    Document 1    Filed 11/12/24    Page 33 of 42

common law powers, and pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent

and restrain Defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18.

### A.    Jurisdiction

92.    Defendants are both engaged in, and their activities substantially affect, interstate

commerce. UnitedHealth provides home health and hospice services in many states. Amedisys

also provides home health and hospice services in numerous states. The Court therefore has

subject-matter jurisdiction over this action under 15 U.S.C. § 25 and 28 U.S.C. §§ 1331, 1337(a),

and 1345.

### B.    Personal Jurisdiction and Venue

93.    Defendants conduct business within the District of Maryland; UnitedHealth has

14 home health locations in Maryland, and Amedisys has 12 home health and hospice locations

in the state. UnitedHealth also has both an orientation and training center and a separate

"Network Management" center in Columbia, Maryland, as well as a remote billing office, that

employs 100 individuals, in Frederick, Maryland to support its home health business. Defendants

are thus subject to personal jurisdiction within this District and venue is proper under 15 U.S.C.

§ 22 and 28 U.S.C. § 1391.

## VIII.    <u>VIOLATIONS ALLEGED</u>

### <u>COUNT I: SECTION 7 OF THE CLAYTON ACT</u>
### (By Plaintiffs Against UnitedHealth and Amedisys)

94.    Plaintiffs hereby incorporate paragraphs 1 through 93 above as if set forth fully

herein.

95.    Unless enjoined, the effect of the proposed acquisition may be to substantially

lessen competition for home health services in hundreds of local markets throughout the United

States ("relevant home health markets"), in violation of Section 7 of the Clayton Act, 15 U.S.C.

§ 18, by:

      a.  Increasing concentration in the relevant home health markets to levels that are so

clearly indicative of lessened competition as to render UnitedHealth's acquisition presumptively

unlawful;

      b.  Eliminating head-to-head competition in the relevant home health markets;

      c.  Stagnating or worsening non-price dimensions of competition, such as quality and

service, in the relevant home health markets;

      d.  Raising prices and worsening terms for patients in markets for home health

services sold to Medicare Advantage; and

      e.  Reducing competition generally in the relevant home health markets.

      96.     Unless enjoined, the effect of the proposed acquisition may be to substantially

lessen competition for hospice services provided to traditional Medicare beneficiaries in dozens

of local markets throughout the United States ("relevant hospice markets"), in violation of

Section 7 of the Clayton Act, 15 U.S.C. § 18, by:

      a.  Increasing concentration in the relevant hospice markets to levels that are so

clearly indicative of lessened competition as to render UnitedHealth's acquisition presumptively

unlawful;

      b.  Eliminating head-to-head competition in the relevant hospice markets;

      c.  Stagnating or worsening non-price dimensions of competition, such as quality and

service, in the relevant hospice markets; and

      d.  Reducing competition generally in the relevant hospice markets.

Case 3:25-mc-00010-DJH-RSE    Document 1-3    Filed 06/30/25    Page 36 of 43 PageID
#: 51
Case 1:24-cv-03267-JKB    Document 1    Filed 11/12/24    Page 35 of 42

97. Unless enjoined, the effect of the proposed acquisition may be to substantially lessen competition for the labor of home health and hospice nurses in hundreds of local markets throughout the United States ("relevant labor markets"), in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, by:

    a. Increasing concentration in the relevant labor markets to levels that are so clearly indicative of lessened competition as to render UnitedHealth's acquisition presumptively unlawful;

    b. Eliminating head-to-head competition in the relevant labor markets for (1) home health nurses and (2) hospice nurses;

    c. Stagnating or worsening wages and other employment terms in the relevant labor markets; and

    d. Reducing competition generally in the relevant labor markets.

### COUNT II: VIOLATION OF THE HSR ACT
**(By the United States Against Amedisys)**

98. Plaintiff United States hereby incorporates paragraphs 1 through 97 above as if set forth fully herein.

99. On December 18, 2023, Amedisys chose to submit to the Antitrust Division a certification attesting that it had complied with its Second Request and that its response was "true, correct, and complete" in accordance with the statute and the Rules. At the time of the certification, as Amedisys was aware, its response was not true, correct, or complete in accordance with the statute and the Rules. Amedisys did not identify, as required by statute, the information missing from its production.

100. Amedisys submitted a second certification attesting compliance with its Second Request on August 26, 2024, asserting that its compliance was complete.

101.     Amedisys was in continuous violation of the requirements of the HSR Act each day beginning on December 18, 2023, until at least August 26, 2024.

## IX.     <u>REQUEST FOR RELIEF</u>

102.     Plaintiffs collectively request that, as to Defendants, the Court:

a.     Adjudge and decree UnitedHealth's acquisition of Amedisys to violate Section 7 of the Clayton Act, 15 U.S.C. § 18;

b.     Permanently enjoin Defendants from consummating the proposed acquisition or from entering into or carrying out any other contract, agreement, or understanding, the effect of which would be to combine UnitedHealth and Amedisys;

c.     Award Plaintiffs an amount equal to their costs and fees incurred in bringing this action; and

d.     Grant Plaintiffs other such relief that the Court deems just and proper.

103.     Plaintiff United States requests that, as to Defendant Amedisys, the Court:

a.     Adjudge and decree that Defendant Amedisys violated the HSR Act, 15 U.S.C. § 18a, and that Defendant Amedisys was in violation of the Act for, at a minimum, each day of the period from the time of its erroneous and inaccurate certification on December 18, 2023, through at least the date it re-certified compliance on August 26, 2024;

b.     Order Defendant Amedisys to pay the United States an appropriate civil penalty as provided by the HSR Act, 15 U.S.C. § 18a(g), the Federal Civil Penalties Inflation Adjustment Improvements Act of 2015, Pub. L. 114-74, 129 Stat. 599 (2015) (amending the Federal Civil Penalties Inflation Adjustment Act, Pub. L. 101-410, 104 Stat. 890 (codified at 28 U.S.C. § 2461 note)), and the Federal Trade Commission Rule 16 C.F.R. Part 1, 89 Fed. Reg. 1446 (Jan. 10, 2024);

36

      c.      Award Plaintiff an amount equal to its costs and fees incurred in bringing this action;

      e.      Grant Plaintiff other such relief that the Court deems just and proper.

Case 3:25-mc-00010-DJH-RSE    Document 1-3    Filed 06/30/25    Page 39 of 43 PageID
#: 54
Case 1:24-cv-03267-JKB    Document 1    Filed 11/12/24    Page 38 of 42

Dated: November 12, 2024

Respectfully submitted,

**FOR PLAINTIFF UNITED STATES OF AMERICA:**


| | |
|---|---|
| JONATHAN S. KANTER<br>Assistant Attorney General for Antitrust | */s/ Erin K. Murdock-Park*<br>ERIN K. MURDOCK-PARK*<br>BENJAMIN H. ABLE |
| DOHA G. MEKKI<br>Principal Deputy Assistant Attorney<br>General for Antitrust | SERAJUL F. ALI<br>GIANCARLO R. AMBROGIO<br>AARON COMENETZ<br>CHRIS S. HONG |
| HETAL J. DOSHI<br>Deputy Assistant Attorney General for<br>Antitrust | ADAM KINKLEY<br>JOHN P. LOHRER<br>SONIA M. ORFIELD<br>SARAH V. RIBLET |
| MICHAEL B. KADES<br>Deputy Assistant Attorney General for<br>Antitrust | SARAH R. SCHEINMAN<br>DAVID M. STOLTZFUS<br>PAUL TORZILLI<br>MELODY WANG |
| RYAN DANKS<br>Director of Civil Enforcement | ABIGAIL U. WOOD<br>**Special Appearances Pending**<br>Attorneys |
| SUZANNE MORRIS<br>Deputy Director of Civil Enforcement<br>Operations | United States Department of Justice<br>Antitrust Division |
| GEORGE C. NIERLICH<br>Deputy Director of Civil Enforcement | 450 Fifth Street, NW, Suite 4100<br>Washington, DC 20530<br>Telephone: (202) 445-8082<br>Facsimile: (202) 307-5802 |
| DAVID E. DAHLQUIST<br>Acting Deputy Director of Civil Litigation | Email:  erin.murdock-park@usdoj.gov |
| JILL C. MAGUIRE<br>Acting Chief<br>Healthcare and Consumer Products Section | *Attorneys for Plaintiff United States of America*<br><br>*LEAD ATTORNEY TO BE NOTICED |
| GARRETT M. LISKEY<br>Acting Assistant Chief<br>Healthcare and Consumer Products Section | |

**FOR PLAINTIFF STATE OF MARYLAND:**

ANTHONY G. BROWN
Attorney General

*/s/ Schonette J. Walker*
Schonette J. Walker
USDC Md Bar No. 19490
Assistant Attorney General
Chief, Antitrust Division
swalker@oag.state.md.us

Byron Warren
USDC Md Bar No. 30169
Assistant Attorney General
bwarren@oag.state.md.us

Maryland Office of the Attorney General
200 St. Paul Place, 19th Floor
Baltimore, MD 21202
410-576-6470

*Attorneys for Plaintiff State of Maryland*

**FOR PLAINTIFF STATE OF ILLINOIS**

KWAME RAOUL
Attorney General

<u>/s/ Richard S. Schultz</u>
Richard S. Schultz (*Pro hac vice* forthcoming)
Assistant Attorney General
Richard.Schultz@ilag.gov

Jennifer Coronel (*Pro hac vice* forthcoming)
Assistant Attorney General
Jennifer.Coronel@ilag.gov

John Milligan (*Pro hac vice* forthcoming)
Assistant Attorney General
John.Milligan@ilag.gov

Office of the Illinois Attorney General
115 S. LaSalle Street, Floor 23
Chicago, IL 60603
(312) 814-3000

*Attorneys for Plaintiff State of Illinois*

**FOR PLAINTIFF STATE OF NEW JERSEY:**

MATTHEW J. PLATKIN
Attorney General of New Jersey

*/s/ Yale A. Leber*
Yale A. Leber (*Pro hac vice* forthcoming)
Deputy Attorney General
Antitrust Litigation and Competition Enforcement
Section
Yale.Leber@law.njoag.gov

Isabella R. Pitt (*Pro hac vice* forthcoming)
Deputy Attorney General/Assistant Chief
Antitrust Litigation and Competition Enforcement
Section
Isabella.Pitt@law.njoag.gov

New Jersey Office of Attorney General
Division of Law
124 Halsey Street – 5th Floor
Newark, NJ 07102
(862) 381-4150

*Attorneys for Plaintiff State of New Jersey*

**FOR PLAINTIFF STATE OF NEW YORK:**

LETITIA JAMES
ATTORNEY GENERAL OF NEW YORK

*/s/ Saami Zain*
Saami Zain (*Pro hac vice* forthcoming)
Assistant Attorney General
Saami.Zain@ag.ny.gov

Amy E. McFarlane (*Pro hac vice* forthcoming)
Deputy Chief, Antitrust Bureau
Amy.McFarlane@ag.ny.gov

Elinor R. Hoffmann (*Pro hac vice* forthcoming)
Chief, Antitrust Bureau
Elinor.Hoffmann@ag.ny.gov

Christopher D'Angelo (*Pro hac vice* forthcoming)
Chief Deputy Attorney General
Economic Justice Division
Christopher.D'Angelo@ag.ny.gov

New York State Office of the Attorney General
28 Liberty Street
New York, NY 10005
(212) 416-8262

*Attorneys for Plaintiff State of New York*